UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                    |   |                      |
|------------------------------------|---|----------------------|
|                                    | ) |                      |
| UNITED STATES OF AMERICA           | ) |                      |
|                                    | ) |                      |
| v.                                 | ) | CR. NO. 04-10044-MLW |
|                                    | ) |                      |
| EDWIN SERRANO, A/K/A               | ) |                      |
| "KING PSYCHO",                     | ) |                      |
| Defendant.                         | ) |                      |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

On September 6, 2005, the defendant, Edwin Serrano, a/k/a "King Psycho" ("Serrano" or "defendant"), pled guilty to Counts 1 and 2 of the Superseding Indictment ("the Indictment") in this case. The Indictment charged Serrano with distribution of 5 grams or more of cocaine base, also known as "crack" cocaine, and cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count One); and distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Two). The Presentence Report ("PSR") prepared by the United States Probation Office, dated February 1, 2006, correctly sets forth the sentencing guideline range as 262 to 327 months, based on an adjusted offense level of 34 and a Criminal History Category of VI.

The sentencing guideline range, as properly noted in the PSR, is based on (1) the drug weight (7.2 grams of cocaine base, a/k/a "crack cocaine"), and (2) the defendant's status as a career offender, within the meaning of U.S.S.G. § 4B1.1 and 28 U.S.C. § 994(h). The PSR also correctly concluded that the defendant is subject to a 10-year, statutory mandatory minimum

sentence pursuant to 21 U.S.C. §§ 841(b) (over 5 grams of crack cocaine) and 851 (prior drug trafficking conviction).  The government recommends that the Court sentence the defendant to a term of incarceration of 262 months, representing the low end of the guideline range, to be followed by a term of supervised release.

## I.   BACKGROUND--THE ALMIGHTY LATIN KING/QUEEN NATION[1]

In 2002, the Federal Bureau of Investigation ("the FBI") commenced an investigation into drug trafficking and other suspected criminal behavior in the Lawrence, Massachusetts area by members of the Almighty Latin King/Queen Nation ("the Latin Kings").  Over the course of the investigation, cooperating witnesses ("CWs") working for the FBI made approximately 50 purchases of heroin, cocaine, and cocaine base from members and associates of the Latin Kings.  The investigation culminated in February 2004 with the indictment of 21 members and associates of the Latin Kings on drug trafficking charges (eighteen were

---

[1] This background section on the Almighty Latin King/Queen Nation is derived largely from the Affidavit of FBI Special Agent Mark Karangekis, which was filed in support of detention in each of the cases filed in this district.  See, e.g., United States v. Victor Arroyo and Angel Rivera, 04-10053-RCL; United States v. Juan Conce; 04-10049 WGY.  The government subsequently learned that information provided by one of the cooperating witnesses (the "CW"), and put in the affidavit, to the effect that he/she had been fined $500 by the Latin King leadership for failing to pay tribute, was in fact fabricated by the CW for purposes of stealing $500 from the FBI.  This was then disclosed to respective defense counsel in those cases in which the affidavit was filed.

charged federally in this district and 3 were charged by the Essex County DA's Office).

The Latin Kings was formed in the l960s in Chicago.  It's stated organizational purpose was the organization of Hispanics dedicated to overcoming an "oppressive government" and uplifting all "third world" people.  The Latin Kings developed a "Manifesto" of laws, rules, and regulations governing the behavior of its members which has evolved into a detailed code or organizational and behavioral principles.  In its early years, the Latin Kings formed small coalitions to protect the interests of its members.  As time passed, however, coalitions known as "strike back groups," developed into traditional street gangs who wanted to protect their "turf" from outsiders and rivals.

The desire to protect "turf" and a strict "code of silence" as outlined in the "Manifesto" has created a culture of secrecy and institutional violence within the Latin Kings.  Latin King members are expected to come to the aid of their fellow members on request.  Hence, whenever the economic or other interests of the gang (such as its primacy in certain designated geographic areas or the drug trafficking activities of its members) are threatened, members are required to join in on organized actions aimed at mutual protection.  These actions frequently take the form of "missions" i.e., acts of violence directed at rivals.

The Latin Kings have a highly organized rank structure on

the National, Regional, and local levels.  The leadership at each level is comprised of a Supreme Crown Inca and an Executive Crown of officers consisting of a Carsique, (or second-in-command), a Minister of Defense (responsible for meting out punishment, waging war against rivals, and maintaining the gang's arsenal), a Treasurer (responsible for the collection of dues, tribute and fines and the maintenance of a common pool of money known as a "fundle" used to support concerted activities such as bailing members out of jail and purchasing weapons) and a Secretary (responsible for maintaining records and the administration of the gang's business).

    Although the Latin Kings originated in the Midwest, they now have Regional and Local Chapters throughout the Eastern United States.  Regional Chapters must be sanctioned by the national leadership in Chicago.  Each Regional Chapter must then sanction its local chapters.  While each Regional Chapter adheres to the laws and regulations set out in the Manifesto, the Regional Chapters typically have their own regional policy book to guide the leadership and regulate the behavior of its membership.  The Latin King's Massachusetts's policy book, which was seized during this investigation, includes such things as a Membership Application, Voting Form, a "Convict's Code of Conduct," a Guide to starting a local chapter of the Latin Kings in Massachusetts, and a form for funeral arrangements for Latin King members.

The PSR accurately describes the facts underlying the convictions in this case, which, for convenience, are briefly summarized here.

Much of the revenue used to operate the Latin Kings flows from illegal activities of its members.  Although the distribution of marijuana is the only drug trafficking formally accepted by the gang, in fact gang members sell a wide range of illegal drugs and, as the CW in this case learned, are expected to remit a portion of their drug proceeds to the local leadership.  The atmosphere of interdependence and secrecy that surrounds the Latin Kings often leads members to sell illegal drugs together.

The atmosphere of interdependence that pervades the Latin Kings also results in the use of institutional violence often imposed to protect the illegal activities of gang members. Unwanted competition from other drug traffickers, turf threats from rival gangs, or any conduct that is perceived to be disrespectful to the Latin Kings or its members can produce a call to the membership and result in what is known as "Missions," i.e., organized violence or shootings.[2]

---

[2] In this case, for example, a cooperating witness was contacted by VICTOR ARROYO, A/K/A "KING VICIOUS", and directed to participate in a "Mission" against Dominican drug traffickers who had assaulted a member of the gang in Lawrence and were threatening the geographic primacy of that individual's drug trafficking.  Local police went to the meeting location and found a large group of known Latin King members congregating.  Because

The defendant was identified during the course of the investigation as a member of the Latin Kings. More information regarding the Latin Kings, and the defendant's role in the organization, is set forth in the detention affidavit filed in connection with this case. <u>See</u> Dkt. 6.

The present indictment resulted from one aspect of this investigation: the distribution of cocaine and cocaine base by Edwin Serrano, a/k/a "King Psycho". On February 27, 2003, Serrano sold a cooperating witness working with the FBI (the "CW") 7.2 grams of crack cocaine. On April 4, 2003, Serrano sold the CW 7 grams of cocaine. Both buys were surveilled by law enforcement agents and recorded on audio and video tape, and are accurately summarized in the PSR.

## II.  THE DEFENDANT'S CRIMINAL HISTORY

Serrano is a career offender, with a record of serious criminal offenses, and would be in criminal history category ("CHC") V but for application of the career offender provision (which puts him in CHC VI). PSR ¶ V. The defendant's career offender predicates include two separate convictions for trafficking cocaine (from 1994 and 1996), PSR ¶¶ 58 & 60; a 1994 conviction on four counts of assault with a dangerous weapon (a gun), PSR ¶ 58; and related 1994 convictions for assault with intent to rape and indecent assault & battery on a person. PSR ¶

---

of the information provided by the CW, they were dispersed.

59.   PSR ¶¶ 58 & 113.[3]

With respect to the assault with intent to rape conviction, the PSR notes that the defendant and three other men approached a woman on the street in Lowell, that one of the men grabbed the woman's arms and pinned them behind her back, and describes what happened next as follows:

> The defendant stood in front of her and said, "Who do you think you are?  I'll take whatever I want from you."  The defendant reached into the women's pocket and took $15. Then, the defendant put his hand inside the woman's pant's and broke the zipper.  He attempted to put his finger into her vagina, but was prevented from doing so because she was wearing a tampon which he removed and discarded.  While doing this, the defendant placed his other hand under the woman's shirt and grabbed her breast.  The woman began screaming, was released, and ran.  While she was running, she heard the defendant yell, "If you call the cops, we'll blow your head off."

PSR ¶ 59.

The defendant also has convictions (related to those above), for unarmed robbery, threats, and removing/mutilating a firearm serial number.  PSR ¶¶ 58 & 59.  The defendant also has a pending charge from 2002 out of Lawrence District Court for illegal possession of cocaine,  PSR ¶ 67, and was arrested in 2000 for, *inter alia*, kidnapping, assault & battery with a gun, and threatening to commit murder (all charges were dismissed), and in 2002 for assault & battery (charges dismissed).  PSR ¶¶ 73-74.

---

[3] Serrano was incarcerated on these various charges from June 1994 to November 15, 1995, and from June 1996 to December 3, 1999, including a stay at MCI Cedar Junction.  PSR ¶¶ 113-14.

Finally, the defendant also has five abuse prevention orders filed against him by two different women and one man.  PSR ¶¶ 93-97.  When applying for an abuse prevention order in June 2000, Raquel Tavares wrote that the defendant "held a gun to the back of my head and he fired the gun in the air three times."  PSR ¶ 96.  In several of the other cases, the women requesting the orders reported being hit by the defendant and the defendant threatening to kill them.  See PSR ¶¶ 93-95.

## III.  THE CAREER OFFENDER PROVISION OF THE GUIDELINES

The defendant will presumably argue that the Court should not sentence him as a "career offender" in light of the determination in Booker that the United States Sentencing Guideline's are only advisory.  The career offender provision of the Guidelines, however, is unique and should be accorded particularly heavy weight by sentencing courts.  The Sentencing Commission promulgated the career offender provision pursuant to a clear and specific Congressional policy declaration which was embodied in statute.  In 28 U.S.C. § 994, entitled "Duties of the Commission", Congress directed the Commission to create a guidelines provision that would ensure that a certain, defined category of repeat offenders (so called "career offenders") would be sentenced to a term of imprisonment at or near the maximum term authorized.

Section 994 directed the Commission as follows:

(h) The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and--

    (1) has been convicted of a felony that is--

        (A) a crime of violence; or

        (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.); and

    (2) has previously been convicted of two or more prior felonies, each of which is--

        (A) a crime of violence; or

        (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.).

28 U.S.C. § 994(h).

In light of this Congressional directive, the Sentencing Commission promulgated the career offender provision of the guidelines -- U.S.S.G. §4B1.1, which essentially mirrors 28 U.S.C. § 994(h).  There can be little doubt that the defendant is precisely the type of offender that Congress and the Commission had in mind when promulgating the career offender provisions of § 994(h) and § 4B1.1.  Accordingly, this Court should accord particularly heavy weight to the guideline sentencing range in

this case (262 to 327 months) because it is based so clearly on both the Congressional and Commission view that career offenders should be sentenced to a term of imprisonment at or near the maximum allowable.

For the same reasons that the career offender provision is so applicable in this case, the factors listed in 18 U.S.C. § 3553 also support a sentence within the guideline range.  In particular, a sentence of 262 months reflects the seriousness of the offense in this case (selling crack cocaine); the history and characteristics of the defendant (two prior drug trafficking convictions, convictions for assault with a gun, assault with intent to rape, and unarmed robbery); promotes respect for the law (i.e., that at some point, when a defendant has amassed a serious criminal history, indicating repeated crimes of the same type--here, selling drugs and being engaged in violent crime--it is necessary to remove the defendant from society for a lengthy period); and will provide deterrence and protect the public from further crimes of the defendant.

In short, this is a case where the collective wisdom of Congress and the Sentencing Commission in promulgating the career offender provision reaches the correct and just result, and there is no reason to deviate from that result.  For the foregoing reasons, the government recommends that the Court sentence the defendant to a term of imprisonment of 262 months.

## CONCLUSION

For the foregoing reasons, and those set forth in the PSR, the government recommends that the Court sentence the defendant to a term of incarceration of 262 months, representing the low end of the guideline sentencing range.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney,

By:   /s PETER K. LEVITT
      PETER K. LEVITT
      Assistant U.S. Attorney
      One Courthouse Way
      Boston, MA 02210
      (617)748-3355

February 8, 2006